WILLIAM GLASGOW ET AL., Respondents, *v.* CITY OF ST. LOUIS ET AL., Appellants.

### February 12, 1884.

1. STREETS — TOWN PLAT ACT. — The act relating to town plats (Rev. Stats. 1845, p. 1536) applies to incorporated cities.

2. —— PUBLIC TRUSTS. — Control over public streets is vested in municipal corporations as a public trust to be exercised for the benefit of all the inhabitants of the State.

3. —— SCHEME AND CHARTER — ST. LOUIS. — The trust as to streets dedicated under the act of 1845, which devolved upon the county of St. Louis, now devolve upon the city of St. Louis under the Scheme and Charter.

4. —— ULTRA VIRES — INJUNCTION. — The city of St. Louis has no power to lease for twenty years a street dedicated and opened to public use under the act of 1845, and may be enjoined from so doing at the suit of any property holder who would be thereby specially injured.

APPEAL from the St. Louis Circuit Court, LUBKE, J. *Affirmed.*

TRUMAN A. POST, with whom is LEVERETT BELL, for the appellants : Under the charter and ordinances of the city of St. Louis, then in force, the relinquishment of Papin Street, by the Glasgows, in 1854, gave the city the same rights thereto as in case of ordinary streets, and among others the right to abolish the same. — *Kimball* v. *Kenosha*, 4 Wis. 321; *Gray* v. *Iowa Land Co.*, 26 Iowa, 387. When ordinance 12,457 was passed, the charter of St. Louis had been amended so as to give the city council power to vacate streets ( Charter 1876, Art. III., sect. 26 ; subd. 26, Rev. Ord. 1881, p. 122) ; the city council had the right to declare the strip of Papin Street, between Twelfth and Thirteenth Streets, vacant for twenty years ; and to receive for so doing the money and land provided for in the ordinance. — *Polack* v. *Orphan Asylum*, 48 Cal. 490 ; *Boston* v. *Richardson*, 13 Allen, 153. See further, *Bissell* v. *N. Y. Cent. R. Co.*, 23 N. Y. 64 ; *Hammond* v. *McLachlan*, 1 Sandf.

342; *Stiles* v. *Curtis*, 4 Day, 328, 334; Dill. Mun. Corp., p. 632, sect. 633 [496]; 3 Kent's Comm., *433, 434, note *d; Perrin* v. *N. Y. Cent. R. Co.*, 36 N. Y. 124; *Weissbrod* v. *Chic. & N. W. R. Co.*, 18 Wis. 44; *Wyman* v. *Mayor*, 11 Wend. 502; *Pettingill* v. *Devin*, 35 Iowa, 356; *White* v. *Godfrey*, 97 Mass. 472; *Day* v. *Schroeder*, 35 Iowa, 356.

M. L. GRAY, for the respondent: Rev. Stats. 1845, p. 1056, sect. 6, vested in the county, now the city, the title of the street in trust for the purposes and uses declared, and for no other uses whatever. This trust will be enforced by the courts. — 2 Dill. Mun. Corp. (3d ed.), sect. 653, and cases cited in note 1; *Rutherford* v. *Taylor*, 38 Mo. 315, 318; *Price* v. *Thompson*, 48 Mo. 361, 364, 365; *Town of Cameron* v. *Stephenson*, 69 Mo. 378 (declaring effect of town plats); *Lackland* v. *N. Mo. R. Co.*, 31 Mo. 180, 185. Raborg's surveying Papin Street through the forty-three feet of his land, recording said survey and conveying the lots according thereto, and bounding them on Papin Street, was a valid dedication and clothed the county (afterwards city) with the trust to use it only as a public street. — 2 Dill. Mun. Corp. (3d ed.), sect. 640, note 2. *Rector* v. *Hart*, 8 Mo. 457; *Hannibal* v. *Draper*, 15 Mo. 634, 640; *Thurston* v. *St. Joseph*, 51 Mo. 510, 512, 516, 517; *Rose* v. *St. Charles*, 49 Mo. 511. The city has no power to alien or dispose of streets held in trust for public use. — 2 Dill. Mun. Corp. (3d ed.), sect. 650 and authorities in note 1, sects. 651, 575 and note 1, sect. 660; *Warren* v. *Lyons*, 22 Iowa, 351, 354; *The Commonwealth* v. *Bowman*, 3 Pa. St. 203; *The State* v. *Atkinson*, 24 Vt. 448; 18 Ohio St. 221; *Trustees* v. *Perkins*, 3 B. Mon. 440; *Alves* v. *Tr. of Henderson*, 16 B. Mon. 168; *Trustees* v. *Hoboken*, 33 N. J. L. 19; *Alton* v. *Ill. Transp. Co.*, 12 Ill. 60; *Ransom* v. *Boal*, 29 Iowa, 68, 70; *Matthews* v. *Alexandria*, 68 Mo. 119.

THOMPSON, J., delivered the opinion of the court.

This is a suit in equity for an injunction to restrain the defendants from stopping up a street in the city of St. Louis. At the hearing the circuit court decreed a perpetual injunction, and the defendants have appealed.

Under appropriate pleadings, the following facts appeared : The defendant, the Shickle, Harrison & Howard Iron Company, a manufacturing corporation, at and prior to the dates with which we are concerned, was the owner of all the land fronting on both sides of Papin Street, between Twelfth and Thirteenth Streets ; that all of the block north, and half of the block south of this part of Papin Street, were occupied by the foundry works of this corporation ; that, on an average, one hundred and twenty tons of iron were hauled per diem along that part of said street ; that said company employed a force of men in its works averaging nearly five hundred, who, with their families, were supported by earnings from the company ; that said portion of Papin Street was in almost continual use by the company's teams during the day ; that Papin Street was broken off on the east by Twelfth Street for two blocks or so, when a street nearly in line with it, called Orchard, or perhaps Papin Street, ran east a block or two, and was again cut off as far east as Seventh Street, when it again commenced and ran east ; that Gratiot Street and Chouteau Avenue, parallel with and adjoining Papin Street on the north and south, were continuous thoroughfares to the central portion of the city ; that, in point of fact, Papin, between Twelfth and Thirteenth Streets, was scarcely travelled at all except by the employés and teams of the company, in consequence of the smoke, noise, and dust, and hauling of teams by the company's foundry ; that the use of said strip of Papin Street by buildings and machinery of the company was becoming highly essential to it in its business, and if it could not be so appropriated the company might be compelled to remove its foundry across the river ;

and that horse cars were running to and fro along Chouteau Avenue and Fourteenth Street, one block from Papin and Thirteenth Streets respectively, and that Thirteenth Street was open to Chouteau Avenue.

Such was the state of facts when the city of St. Louis, in pursuance, as it seems, of an agreement made with the Shickle, Harrison & Howard Iron Company, passed the following ordinance : —

" An ordinance providing for the vacation of Papin Street, between Twelfth and Thirteenth Streets, on the dedication to the public of a triangular slip of ground in city block 440.

" *Be it ordained by the Municipal Assembly of the City of St. Louis, as follows:*

" SECTION 1. So much of Papin Street as lies between Twelfth and Thirteenth Streets is hereby declared to be vacated as a public street, and the use thereof for twenty years from the approval of this ordinance is given to the owners of the property abutting thereon, at the expiration of which time the property embraced in the street shall revert to the city as a public thoroughfare.

" SECT. 2. This ordinance is not to take effect nor be in force unless a triangular slip of land in city block 441, having a front of twenty feet on Gratiot Street by a depth of one hundred and forty-four feet six inches on Twelfth Street, and bounded as follows: By Twelfth Street on the east, Gratiot Street on the north, and by a line drawn from a point on the south line of Gratiot Street twenty feet west from the intersection with Twelfth Street to a point on the west line of Twelfth Street one hundred and forty-four feet six inches south from its intersection with Gratiot Street, shall have been properly dedicated and surrendered to the city of St. Louis for public use.

" SECT. 3. This ordinance shall not take effect unless within thirty days from its approval by the mayor, the

Shickle, Harrison & Howard Iron Company shall file with the city register its bond to the city of St. Louis, in the penal sum of twenty thousand dollars, with two or more good and sufficient securities, to be approved by the mayor and council, conditioned that said Shickle, Harrison & Howard Iron Company shall save the city harmless from the payment of any costs, damages, judgments, outlay, or expenditures by reason of vacating said street as aforesaid, and at the same time pay into the city treasury the sum of two thousand dollars.''

The title of the city of St. Louis, to that portion of Papin Street which it thus attempts to dispose of for the term of twenty years came to it through certain dedications, as follows : —

1. A dedication made in the year 1854 by the ancestors of these plaintiffs, under the town plat act, which appears in the recorder's office, as follows : —

"The above represents a piece of ground belonging to the undersigned; so much of Chouteau Avenue, Papin Street, Gratiot Street, Thirteenth, and Fourteenth Streets, as here represented and comprised within the same are

hereby relinquished to the public as highways forever; also alleys through blocks 441 and 442.

"Witness our hands and seals the 21st day of June, 1854.

"MARY E. LANE,
"A. E. LANE, TR.,
"M. E. LANE,
"WM. CARR LANE.

2. A strip of ground forty-three feet wide, more or less, of what is now Papin Street, lying next west of Twelfth Street. This did not belong to the plaintiffs' ancestors at the time of the above relinquishment, and was not covered thereby. It was, however, embraced in a plat of Rayborg & Schaffner's addition, which was surveyed by Wm. H. Cozens and filed in the recorder's office in 1856. No relinquishment or dedication was indorsed upon this plat. But it appeared that in 1864 and 1865, partition proceedings took place between the Rayborg heirs, and that, in pursuance of those proceedings, deeds were made in 1865 and 1867, calling for fronts on Papin Street of this remaining strip of forty-three feet. There is, therefore, no question of the dedication to public use as a street of Papin Street for the entire distance between Twelfth and Thirteenth Streets.

In 1848, prior to these dedications, the city passed an ordinance numbered 1752, establishing one hundred and seventy-seven streets and parts of streets, the title and first and third sections of which are as follows : —

"An ordinance establishing the wharf, streets, alleys, and public places.

"*Be it ordained by the City Council of the City of St. Louis.*

"SECTION 1. The following wharf, streets, and parts of streets are hereby established. * * * Papin street from Fifth Street to Seventh Street fifty feet wide, at a dis-

tance of four hundred feet south and parallel to Gratiot Street; fifty feet wide from Eleventh Street westwardly to Tayon Avenue, at a distance of three hundred and fifteen feet six inches north of and parallel to Chouteau Avenue.

" SECT. 3. Nothing in this ordinance shall be so construed as opening and making said streets or any part of them public highways unless the ground has been dedicated to or acquired for public uses in a lawful manner or relinquished to the city by the owner or owners of the ground through which the said streets or parts of streets shall pass."  *  *  *

. For years prior to the passage of the ordinance under which the city is now attempting to transfer the use of this portion of the  street for twenty years to the Shickle, Harrison & Howard Iron Company, Papin Street, between Twelfth and Thirteenth Streets, had been paved and guttered; Twelfth Street had been opened to the north and south intersecting Papin Street, and two lines of horse cars had been established thereon, communicating with the center and south and  southwest parts of the city.  It further appeared that Papin Street extends west from Twelfth Street to Grand Avenue; that it is partially built up through that distance, and that the plaintiffs own houses on Papin Street west of Fourteenth Street, and all of the land on both sides of Papin Street between Thirteenth and Fourteenth Streets, except one lot.  Testimony was given on the part of the plaintiffs to the effect that the closing of Papin Street between Twelfth and Thirteenth Streets would be injurious to their property; that persons living on that part of Papin Street west of Thirteenth Street would have to go the distance from Papin Street to Gratiot Street (one block north), or from Papin Street to Chouteau Avenue (one block south), further than otherwise in order to reach the Twelfth Street cars, if said strip of Papin Street were closed.  Testimony was also given on the part of defend-

ants to the effect that the closing of Papin Street between Twelfth and Thirteenth Streets would not injure the value of property west of Thirteenth Street. This conflicting testimony is not set out *in hæc verba* in the bill of exceptions, nor is it set out more fully than we have stated it. It, therefore, does not afford a basis upon which we can revise the conclusion of the circuit court upon the question of fact whether the property of the plaintiffs will be injured by the proposed shutting up of Papin Street, or upon which we can determine the extent of the injury. It enables us to see that there was testimony which authorized the circuit court to find that the plaintiffs would be materially injured by this shutting up of Papin Street, and that they would, by reason of the situation of their property on both sides of Papin Street immediately west of Thirteenth Street, suffer an injury different in degree and kind from that suffered by the public generally. We must, therefore, hold in the beginning, that, in the state of the record, the question whether the plaintiffs have a standing in a court of equity to complain of the proposed obstruction, that is to say, whether they will suffer what the law terms special damage, in consequence of it, can not be made a subject of controversy.

Nor can the Shickle, Harrison & Howard Iron Company be heard to say, as a reason why the plaintiff will not be specially damaged by the shutting up of the street, that they, in the prosecution of their business, have substantially monopolized it to the exclusion of the public; for this would allow them to set up the commission of one wrong as a reason why they should be allowed to commit a greater wrong. No doubt they may, in the prosecution of their business, lawfully make such a frequent and constant use of this portion of the street as will render its use less convenient to the rest of the public as a thoroughfare; but if they have monopolized it entirely, they have committed an actionable wrong, such as would enable any person specially damaged thereby to maintain an action at law for such

damages, or to invoke the powers of a court of equity to prevent the continuance of the wrong.

This question out of the way, it remains to consider whether, upon the disclosures of this record, the city of St. Louis is to be taken to have the power to shut up Papin Street between Twelfth and Thirteenth Streets, in the manner in which it proposes to do it. Such power is invoked under a provision of the charter of the city which clothes the mayor and assembly with power "to establish, open, vacate, alter, widen, extend, pave, or otherwise improve and sprinkle all streets, avenues, sidewalks, alleys, wharves, and public grounds and squares, and provide for the payment of the costs and expenses thereof, in the manner in this charter prescribed." Sect. 26, sub-division 2, of the Charter of St. Louis. It is claimed that the city had power to pass the ordinance in controversy under the above grant of power to "vacate" streets. We do not think that this can, in any proper sense, be called a vacation of a public street. Control over the public streets is vested in municipal corporations as a public trust to be exercised for the benefit of all the inhabitants of the state. *Kreigh* v. *Chicago*, 86 Ill. 407. The vacation of a street, in respect of which a municipal corporation has assumed this trust, is nothing more than a relinquishment of the trust upon a view that the public good no longer requires its exercise. The city, in vacating a street, in effect declares that it will no longer execute the trust which has been reposed in it, in which it incurs certain legal responsibilities to individuals. It will no longer be responsible for not keeping it open as a street, nor will it be liable to travellers who may be injured in consequence of its not keeping it in proper repair as a street. But this is quite a different thing from the selling or leasing for a consideration to private persons for a term of years of the street itself to the entire exclusion of the public. If any authority upon such a point were wanted, it is found in the decision of our supreme court in

*Lackland* v. *The North Missouri Railroad Company* (31 Mo. 180, 187). In that case the city of St. Charles undertook to grant to the North Missouri Railroad Company, for a valuable consideration, the right of way through one of its streets. It appeared that the exercise of this right by the railroad company would substantially exclude the public from the use of the street as a thoroughfare. The charter of the city of St. Charles gave it the power to " open, alter, abolish, widen, extend, establish, grade, or otherwise improve and keep in repair streets." This, the supreme court said, " is a very extensive grant; but it can hardly be construed to reach a case like this. A street may be ' established or opened ' on ground where no street existed before; but, of course, this can only be done by compensating the owners of the ground. A street may be widened, but this can only be done upon the same terms. A street may also be abolished, but in that event the ground reverts to its original proprietors, whether they are the owners of coterminous lots or those who first dedicated the streets to the public use. It is manifest that such an appropriation of a street as was made in this case does not look to its abolishment; it only tends to its monopoly. It is still used as a thoroughfare, but appropriated exclusively to the use of a particular corporation and a particular description of transportation. It is no exercise of the power to abolish, and it is not pretended that it had any tendency to ' improve ' or ' keep the street in repair.' The charter of St. Charles, therefore, did not warrant such an appropriation of Main Street as is claimed."

This is a stronger case for the application of the principle thus declared than was that case; for the ordinance in that case did not attempt to confer the exclusive use of the street upon the railroad company. The public still had some rights therein. The railroad company did not become the private owner or lessee of the ground. It was still lawful for the public to use it as a street, in common

with the railroad company so far as they could do so ; and the railroad company had no power to exclude them from such common use of it. But the ordinance in this case purports first to vacate the street, and then to grant the use of it for twenty years to a private corporation. This is not such a vacating of a public street as allows the fee to re-vest in the party who originally dedicated it to the public ; but it is an appropriation of a public street to a private use. It is a leasing of it for a consideration and for a term of years to a private person. It is not a relinquishment of the trust on which the city holds it, but it is a breach of that trust. Where the trust is merely relinquished or abandonded, in the discretion of the legislative authority of the city, upon a view that the public interest no longer re-quires its exercise, it may be again resumed, whenever the same body shall be of opinion that the public interest does require its exercise ; that is to say, the street may be again opened by condemnation proceedings. But where the city leases the ground of the street for a term of years to a pri-vate owner, it estops itself by its own grant from resuming possession of the ground as a street until the expiration of the term of the grant. The present municipal assembly, exercising a temporary trust, clearly has no power to make a grant which shall estop future legislatures of the city from exercising the power conferred upon them by the charter of opening, altering, or widening streets. It is clear, then, that this ordinance is not an exercise of the power conferred by the charter of the city to vacate streets, but that it is *ultra vires* and void.

We have reached this conclusion upon the assumption that, in respect of this particular portion of Papin Street, the municipal assembly has the same power which it has over any other street of the city, without reference to the man-ner in which the street was established. But it appears that all of Papin Street, which the city thus proposes to grant for twenty years to the Shickle, Harrison & Howard

Iron Company, except the forty-three feet already mentioned, was formally dedicated to the city under a statute known as the town plat act, by the ancestors of these plaintiffs. This being so, the language of that statute and the decisions of the supreme court thereunder, are decisive in favor of the rights of the plaintiffs in this case, unless the defendants' contention is correct, that the town plat act does not apply to incorporated cities like St. Louis. We know of no ground whatever for this contention. Although the act, as it stood in the statutes at the time when the plaintiffs' ancestors recorded the plat in this case did not use the word city, but only used the words " town or village," yet there is no doubt whatever that it was intended to include incorporated cities. The act was originally passed in an early day in the history of our legislation, and it is well known that, in former times, St. Louis was designated as a town. The word town is used to designate " any collection of houses larger than a village. In this use the word is very indefinite, and a town may consist of twenty houses, or of twenty thousand. * * * A city is even called a town.'' Web. Dic. *verb.* Town. Section 8, of the town plat act is as follows : " Such maps and plats of such towns and villages, and additions, made, acknowledged, certified, and deposited with the recorder, shall be a sufficient conveyance to vest the fee of such parcels of land as are therein expressed, named, or intended for public uses, in the county in which such town, village, or addition is situate, in trust and for the uses therein named, expressed, or intended, and for no other use or purpose.'' Rev. Stats. 1845, p. 1056, sect. 6 ; Rev. Stats. 1855, p. 1536, sect. 8.

The trust expressed in the plat recorded by the ancestors of the plaintiffs in 1854, as already stated, was that the streets designated on such plats " are hereby relinquished to the public as highways forever.'' By section 8 of the town plat act above quoted, the fee of the streets embraced in this plat became vested in the county of St. Louis, " in trust for

the uses therein named, expressed, or intended, and for no other use or purpose;" that is, it became vested in the county of St. Louis as "highways forever," "and for no other use or purpose." By the separation of St. Louis County from St. Louis city, under the Scheme and Charter, and by the provisions of the charter (perhaps also under earlier charters), this trust was devolved upon the city. The city in leasing it for twenty years to a private person now attempts to subject it to another use or purpose; and this is clearly a breach of the trust with which the city has been clothed in respect of it. That the city will be enjoined from committing such a breach of trust at the suit of any property owner who would be specially injured thereby is shown by the decisions of the supreme court in *Rutherford* v. *Taylor* (38 Mo. 315), and *Price* v. *Thompson* (48 Mo. 361). "Nothing," said Wagner, J., in the latter case, "can be clearer than that if a grant is made for a specific, limited, and definite purpose, the subject of the grant can not be used for another and a different purpose. The town took the premises as a trustee with the obligations attached, as well as the privileges conferred, and it was not competent for it to divert them to a use or purpose foreign to the expressed intention of the grantor."

The jurisdiction of courts of equity to prevent such injuries by injunction rests upon the clearest grounds. It may be referred to either one of three separate heads of equity jurisdiction. 1. The power to enjoin breaches of trust. This is the ground on which our supreme court proceeded in the two cases just cited. 2. The power to enjoin the purpresture of a public highway at the suit of a person specially damaged thereby, which is merely a branch of the general power of such courts to prevent or compel the abatement of nuisances. *Mayor, etc., of Georgetown* v. *Alexandria Canal Co.*, 12 Pet. 91, 97; *Carlisle* v. *Cooper*, 21 N. J. Eq. 576; *Mayor, etc., of Columbus* v. *Jacques*, 30 Ga. 506, 513; *Green* v. *Oakes*, 17 Ill. 249, 251; *Works* v. *Junction Railroad*, 5 McLean, 425. 3. The power to

enjoin *ultra vires* acts of corporations injurious to private persons. *Hare* v. *London, etc., R. Co.,* 2 Johns. & H. 80, 111; *Raphael* v. *Thames Valley R. Co.,* L. R. 2 Ch. 147; *Rankin* v. *East and West India Dock, etc., R. Co.,* 12 Beav. 298; *Agar* v. *Regent's Canal Co.,* Coop. Cas. 77; *Tinkler* v. *Board of Works,* 2 De Gex & J. 260.

The judgment is accordingly affirmed. All the judges concur.